This is a matter of Finn v. J.B. Hunt Transport. Mr. Unger? Yes, Honorable Judges of the United States Court of Appeals. My name is Neil Unger. Yeah, we need you in front of the mic. I see you guys drew a capacity crowd for this case. We really did, yeah. Yeah, where is everybody? Afraid of the snowstorm, I guess. That's true. It's not here yet. I know. It may not get here. This is Philadelphia. Don't say that. That means it will come here now. I'm sorry. Yes, Honorable Judges of the United States Court of Appeals. If I can interrupt you one more time, I'm sorry. Just pull it down a little bit. Yes, Your Honor. There you go. You might want to give your name and whether you want to have time for rebuttal. You're about right. My name is... As far as you're telling us how honorable we are, and then just go from there. Okay. My name is Neil Unger. George Wright on that, by the way. I'm sorry. I don't count. Oh. I'm Neil Unger. I represent the appellant, Thomas Finn. Your Honors, I would request five minutes rebuttal time. All right. Mr. Unger, you're disputing the existence of a prima facie case. I understand you're saying that even if there is a prima facie case, the pretext was not established. And you're hitting on qualifications. It struck me as I read this that you can have... You're arguing he wasn't qualified because of these problems, but you can have somebody who doesn't perform a job well, but who is nevertheless qualified for the job. Why isn't this that situation? Your Honor, I don't feel the prima facie case is an issue. I don't feel that the... Okay. ...the appellee has any standing to bring that argument. The United States District Judge found that the elements of a prima facie case were made. That was never... There was never a cross appeal filed by the appellate. But counsel, isn't an appellee entitled to argue anything that supports the judgment? So wouldn't that allow them to make this alternate argument? Judge Chigaris, I would take the position that since some of the elements that actually go to the prima facie case actually go to possibly rebutting the presumption if the employer gives a allegedly... prefers a anti-discriminatory reason for the action. I think there is a case... What I'm getting at is your argument makes a whole lot of sense if they're seeking more relief if they had, for instance, won and there's been no cross appeal filed, but they were successful in getting the case dismissed. And my question is aren't they entitled to use any other arguments, even if not adopted by the district court, to support what happened in the district court? I don't think so, Your Honor. The dismissal was for the reason that under Cipollini and Fuentes that the plaintiff specifically did not meet its shifting burden to show that the employer's preferred reason for the termination was a pretext. How did you show it? How did you show enough evidence of pretext to get to a jury on that question? There's actually quite a few factors. I'll start with the factors that also go to the prima facie case. My client, Mr. Finn, retired U.S. Army major, 62 years old, was there 14 years and was replaced by significantly younger people in their 20s. Those people were already trainees, were they not? They were trainees hired out of college. The company had a program to hire younger employees out of college. One of them wasn't recruited. He saw an ad. It wasn't that the company went out and sought out Owens, I guess it was. It wasn't that he was specifically sought out as a youthful replacement. He saw an ad and applied. There was a Ryan Shuck who also got a tip from a friend who was recruited. So generally, though, they were recruiting. You said two different things. You got a tip for a friend. Yes. And you said who was recruited. Well, if you got a tip for a friend and applied, he wasn't really recruited. Well, Mr. Finn was the oldest gentleman at this facility. He was a fleet manager. Basically, in his initial stint as fleet manager, he performed admirably. The appellee conveniently omits that. His performance reviews from 2000 to late 2003 were fine. And then Ms. Sawala comes in. 96, 98, what about those performance reviews? There's one in 98 that's not signed. He disputes it. It's not acknowledged. There's no signature on it. You know, granted, if he was given that, that's five years before he took the job. That's five years before 2003, before Ms. Sawala came in. Go ahead. I'm sorry. You go ahead. Throughout his 14 years, he performed his job admirably and to the best of his ability. Clearly, they would have gotten rid of him. I believe he's entitled to the inference that they would have gotten rid of him in 14 years. And in the last couple of years, they have this phone log, this human resources phone log. Clearly, you have to go to corporate if you have a complaint to get rid of a manager. And there's no entries. Could you elaborate on that a little bit? There's a lot of mention about this log. What exactly is that? I don't think there's any explanation as to what that is. You put complaints in there, is it? Yes, it's complaints by management about employees that they supervise. So there's complaints by Mr. Finn's managers, supposed alleged complaints to human resources. And they're making entries in the phone log, like basically, I'm paraphrasing, caution. Remember Kevin Medley, who was black? He's a protected person, Mr. Finn. Caution. And then other stuff about progressive discipline. Is there testimony, though, about how consistently they use this log? I mean, was there testimony that every time there's a problem, an entry gets made? I don't recall, Your Honor, specific testimony to that extent. I do recall testimony from human resource professional Andrew Rowe and some other managers that this is what they did. They would call corporate in Arkansas when there was a problem and they had to take disciplinary action or were considering disciplinary action. So notably, Mr. Finn's performing the area service manager write-ups have to be out, as I understand the case law. He was terminated from his fleet manager job. There's no write-ups for a year and a half before that. Let me go back to that because you said there was an unsigned report. But didn't he concede a marginal rating on the 96th evaluation by Woodruff? And he also conceded, I thought, a deficiency cited in the 98th report by Lupo. Yes, but for the most part, his evaluations over 14 years, aside from Mrs. Sawala, were very satisfactory. Okay, but it's not that there were no problems before. No, no. Overall, they were fine, Your Honor. Yes, I don't want to be misunderstood. He had a couple of problems now and again, like many people do, throughout their career, minor problems. I thought the crux of your case was that the older managers were assigned an unmanageable workload. He and Mordecai, and the trouble is I don't think Mordecai necessarily supports that. Older managers, he was given specifically. Mr. Finn was given a substantial workload that could not be accomplished. Mr. Mordecai, Your Honor, 58 years old, these are the two oldest people in this facility, testified to the same thing. But Mordecai, did he testify that he was given an unmanageable workload and he thought there was a major problem and that's why he quit? Yes. He didn't seem to support that. I understood from the deposition testimony, as I read it, that he considered it being, quote, unquote, something like, these weren't his exact words, set up to fail. Not only were they not his exact words, he said that he just didn't think that he could do the job, now that they set him up and put him in a position that he couldn't do the job. He said he could not do the job. It was unrealistic. It was unrealistic. When we look at the standard required under Cipollini and Fuentes, I mean, I'm putting forth a lot of facts here that I think support when you view, when you look at the summary judgment standard, I believe the plaintiff should have a right to go to trial on these issues. These are all material issues of fact as to whether or not the reason given by J.B. Hunt is worthy of credence. I mean, there's two paths you can go here. One is, as you say, that somehow they were getting rid of him for younger persons. Or, you know, as the course of time happens, just like you see in marriages, people start going more and more distant. There were more and more problems. There were, it finally was just time for a divorce because there was, he had an attitude issue. They weren't sure he, they didn't see him being able to do the job, and he had many different jobs as manager, five or six. And this one, it just wasn't working out. Now, you're saying that should go to a jury, but you've got to make a decent case to get there. And my problem is on the, I don't see Mordecai supporting you on the older managers being let out. And... But, Your Honor, I think the 14 years. I understand. I mean, if you're going to get, I cannot personally believe, as long as I've been around, which isn't that long, but that somebody would permit somebody in business to cost them money and sit around and not do the job properly for 14 years. That may not be what's going on. He could be in a situation where he's in a new position now, and you're arguing he'd been there 14 years. But he's a fleet manager, and it may just be for whatever reason, he's not meeting Sawulo's expectations. And even assuming that her expectations may be unrealistic, you still have to have something to connect her unrealistic expectation of him to age discrimination. And it may just be that she was much more demanding than anyone else. And on top of this, you have a situation where, I think it was Coulter, who Sawulo reported to. Coulter signed off on at least one negative evaluation. So it isn't just Sawulo's mindset that we have to look at, but there's got to be evidence of pretext that would include an explanation as to why Coulter, and there's no focus of bias that I see here against Coulter, why Coulter would sign off on a negative evaluation, even though he'd been doing okay before that. Your Honor, these points all can be argued on both sides. I mean, there's numerous, numerous facts that supports the plaintiffs, the support that's going to a jury. Just the fact that he was 62 and they didn't do anything to him for the last couple of years means that he was probably performing his job satisfactorily. If that's right, Your Honor, you'd always get to the jury. There's never been such a thing as summary judgment. When you have an employee who is of a certain age and has been in a job for a certain number of years, you're saying there's always enough to get by any suggestion of pretext if the person all of a sudden, not all of a sudden, if the person is terminated because of performance issues. Maybe you're right about that, given the person's track record. Did they offer to him that he should resign? It wasn't an offer. They pressured him. They sat him down and basically said, with Mr. Rowe and Ms. Zawala, here's a release, complicated legal language, here's a severance package, resign. They wanted him, instead of saying, like most companies do, take it home, have an attorney look at it, they pressured him according to his position to sign it then and there, and he was in shock because he thought he was doing well the last couple of years. Despite what was in the record, despite the performance reviews? I mean, obviously, initially, these were good reviews, but the last couple of years, the last three or four years, there were recurring problems.  She's trying to force him out. That's our opinion. They were needs improvement. In his last review, he had one exceeds expectations and four meets expectations on things like dealing with people, et cetera, et cetera. So there's a lot of implausibilities, I believe, and inconsistencies. Okay, we can save some time for rebuttal. Let's hear from Mr. Reesey. Thank you, judges. Thank you. Good afternoon. Carrie Ann Terese from Rollin Henderson on behalf of J.B. Hunt. Mr. Finn was given merit raises during his last two years of employment. Actually, they were not based on merit. We have testimony of his supervisor and other J.B. Hunt managers confirming that they were not based on merit. His manager, Cheryl Sawula, said it was her customary practice to give these raises to all of her employees as more of a morale booster. And, in fact, even those who are not currently meeting all of her expectations, she had still given small increases to him. How much was his increase during the last couple of years, the increases that were given to him? What percentage? I believe one was a $1,000 increase. These were relatively small increases. What was his salary then? I do not have his salary amount at the time of his termination. Okay. I think on page A430 it talks about his salary. He was boosted up to $53,500, I think. He had a 3.5% increase, I think. 3.57. But, again, this was not something that was based on merit, and we have her testifying on that. So everybody got 3.57, or roughly? Well, depending on what year it was and how profitable the company was, that may have changed the percentage, but it was not based at all on their performance. Did the two trainees, the younger folks, did they get merit raises at that time? Well, if we're talking specifically about Cheryl Sawula's employees, then yes. It was across the board for all of her employees. So their percentage, you're saying, would have been higher than 3.57? No, I wasn't saying that. I was saying based on the company's profitability that year, whatever percentage she determined to give, I don't believe that they were given a different percentage. Obviously, if their salary is lower, the end amount that they're receiving is smaller. Let's just get more basic. Sure. There were purported negative evaluations of him, but Finn disputes their accuracy. Isn't that a material issue of fact? Well, I would argue it is not because each time there was a performance evaluation, they met with him in person, reviewed with him. He had an opportunity to voice his objections. We have performance evaluations that are signed by him at his deposition. He confirmed that these elements he was aware of, these were his job duties. He was agreeing to some of the deficiencies, and he agreed that they always met with him in person to review these. And these are the types of things you fire people for after 14 years? I can see if somebody is on probation, you might not want to put them on full status, but it looked like there were issues. Every now and then, he had a big workload, and he might not have treated a customer correctly or he might have been a little sharp with somebody. But are those the things you fire people for? Over time. Now, again, like we've pointed out here on both sides, that he had a long history with the company. I think this shows what everything that J.B. Hunt had done, gone above and beyond to try to give him every possible shot to be successful with the company. And that's part of their company policy, as was the testimony of one of their members of management. With respect to giving him notice of his deficiencies, I noticed there was some depth testimony from one of the supervisors that it wasn't only these formal things, that apparently it was a daily counseling type thing. Is that the case? Correct. These performance evaluations you see are we have annual performance evaluations. If something significant happened, they might do a memo. Otherwise, on a daily basis, he is there working in the same close proximity with his supervisor, who is talking to him daily about reminding him about his job duties, trying to coach him on certain things he needed to improve. So that's why we say in addition to the performance documentation that they formally went over with him, on a daily basis he was getting reminders, warnings verbally. On another note, there seems to be a dispute between the two of you about this is a college recruitment program. Is there such a thing? It is true that they do look at hiring some recent college graduates, as any company would do. There is no, what I think Plaintiff Appellant was trying to argue, is that they're actively recruiting only these young college grads and trying to get rid of older workers and replace them with these young college grads. That is absolutely not true. And in fact, the younger members of management who testified denied that they were part of any such recruitment program. But it is true with any large company that they do look at recent college grads. They may work with some career services organizations, but also they're posting job postings on their website, in newspapers, to the open public, not just college grads. Were these trainees, how many, the last job he had was what, local regional manager, was that it? I believe it was area service manager. The last position he held was fleet manager, which he had returned to. Which was the demotion from the area service manager. Correct, it was a step back down. That was his fifth management position, I think, then the sixth, then he went back to the fifth. How many fleet managers do they have normally? Total for J.B. Hunt? Well, I mean, in his particular area. Well, see, it's a very large company, so I wouldn't even have that number. They do it by region. What about in Elizabeth? At that facility? Is there one or two or three? If you have two trainees and him, there might be a point for the other side that, hey, they're training somebody to get rid of him. Oh, no, that wouldn't be the case. Obviously, if you have a larger facility, as is the case in Elizabeth, New Jersey, there's more than one. There's different shifts that people work. As some of the younger members of management have testified, they worked a different shift from Mr. Finn, so they really weren't even there at the same time. But it's not odd that you would have somebody younger come in as a trainee. You wouldn't necessarily think, oh, I'm about to be replaced. That's not the case. Were the different fleet managers given? The plaintiff points out, or alleges anyway, that the older guy's got additional duties, and he cites ten different duties. Do all fleet managers have the same duties? Correct. That contention that they make about these additional duties is absolutely incorrect. These are the duties that are assigned to every fleet manager, regardless of your age. There's absolutely no evidence whatsoever to support their claim that these were only given to the older managers. Also, I asked you, I'm sorry, about the log. What do you have to say about the big gap there? Sure. This employee relations phone log, what it is basically, it's not required. You are not required to call in to HR every time that there's an incident with an employee. It's simply there if you want to contact HR at the corporate headquarters and either review an issue with them if you're not quite sure how to handle it, and you want to go to the HR people about it, or you want it documented. But it's in no way required, so it's not something that is going to accurately document every single incident with an employee. It just happens to be if someone called in and gave the information, it's documented by the person who takes the call. Are you saying by someone, a customer or a manager, or it could be either? Oh, no, this is definitely in-house. It's for within, it's an internal J.B. Hunt procedure. And then the person who's at the HR department taking the phone call, it's really just a documentation just to show that the call came in and the basics of what the call contained. That's why it's just a phone log. There's a pretty big gap in there, you have to admit, right? Correct. That is true that the log itself does not have entries during that time period. However, there were other documentation showing his deficiencies as well as what we've addressed earlier with the daily verbal warnings and people addressing it with him, specifically not going to the HR department about it. Were there any depositions taken of the trainee managers? Yes, there were. And what did they say as to? Actually, we feel that their testimony is all completely contrary to what plaintiff is trying to argue. He's trying to say that somehow their testimony supports his position that the younger managers were treated differently. Also, he's saying that somehow they felt he was a good guy or a good employee. However, we addressed that by saying, number one, some of these younger managers didn't even work at the same time as him, so they wouldn't be able to testify as to his performance. Also, they were not in a supervisory. Wouldn't that go to the credibility of the testimony, the probative weight? They could still testify. Well, they could testify that, hey, he's a nice guy, he seemed nice, maybe had an hour or so where our shifts crossed over and he seemed like a nice enough guy. But would they be able to testify as to his ability to meet his employer's requirements or perform at a level that was satisfactory to his employer? No. They were not there to observe Mr. Finn in his performance. At the deposition, were they asked the basis for their knowledge? I believe both sides had just talked to them briefly about, well, did you work there at the same time as him? Did you observe him? Obviously, again, they were not in a supervisory role over him, so they were not in any capacity to actually observe his job performance. It was more or less questions about did you get along with him? Did you ever notice anything? I believe counsel may have asked if they had observed any problems or incidents while they were there. Some of the younger managers had said, look, when I was there, I was more concerned with doing the job myself. I really wasn't watching what Mr. Finn was doing in the small amount of time that we were both there. But if there's two different takes on what their testimony was, isn't that, for example, something that should be worked out at trial? I don't believe so, only, again, that, as I've stated, they were not in a capacity to make a determination as to Mr. Finn's job performance. Your first response was that their testimony they gave favors our side more than the other side says it favors their side. That's what trials are for. That's not what summary judgment is about. But I'm saying I don't think there's even an issue, a material fact in dispute to get to that trial. I don't believe their testimony really is they're not qualified to give that testimony about his job performance. If really what we're talking about is, number one, was he qualified in the position, or number two, was the stated reason a pretext for discrimination. I don't believe their testimony comes into that. Let me ask you what I asked Mr. Unger, and you're disputing, why are you disputing his qualifications? Well, I just want to start off and respond to a question I believe, Judge Segaris, you had for my adversary. We do maintain that we are able to present this argument because the Court of Appeals is free to affirm on any ground supported by the record. So that's why we maintain that position and included it in our brief here. So we're maintaining our position that he's not qualified for the position of fleet manager based on the evidence that he was not meeting the requirements. Two different things. I mean, that seems to me that's, again, the kind of argument that we go to. A jury, if you want to argue this guy wasn't qualified, he was there all these years. You saw his ability, you saw his resume, you knew the level of education he'd achieved. If knowing that you make him fleet manager, how can you then turn around and say he wasn't qualified for the job we gave him? That's a different issue as to whether or not he satisfactorily performed that job. As to whether or not he was qualified for the job, you determined he was qualified. You knew his qualifications better than anybody else. How can you now say he wasn't qualified for the job you obviously determined he was qualified for? Well, respectfully, I just want to address that on two points. It's come up a lot here. You know, he was here for 14 years. He was here such a long time, obviously. What is more than that? Right, but what I'm saying is even if you have adequate performance in the past, does not mean that you're still meeting the requirements or still able to perform the job later. Two different questions. You've seen the qualifications and whether or not you perform at it. Let's assume that one of us hires a law clerk because they have a JD degree and let's assume they were editor-in-chief of the Harvard Law Review, qualified to be a law clerk in the Court of Appeals. And they come in and they have absolutely no common sense at all. In every memo they write, they suggest that we write an opinion urging the Supreme Court to overturn Marbury v. Madison, every opinion. The root of this error will be rooted out if the Supreme Court would realize the error of its ways in Marbury v. Madison. Now that clerk is clearly qualified, but that doesn't mean they're any good. Maybe they just can't do the job, but they have the paper qualifications. He's not talking about one of you guys, is he? No, no, no. Neither one's Harvard. When we go back to the Perry case, for example, it's just saying that there's a difference between being qualified for the technical aspects of the job but maybe he's not qualified for the managerial aspects of the job. And I think that's what happened here. I think that he could be technically qualified. He has the background, the training, everything he needs to perform this position, but he just lacks the managerial capacity. And I think that's what happened here with Mr. Fenn. So that's in our view, and with the Perry case, we think that means he was not qualified for this management-type position. We've tried to fit him in other positions, tried to make it work. Well, okay, that's a tough argument to make. And if you were to say, is that your position, that really does come down to the kind of thing a jury might look at that and say, well, wait a minute, they knew his qualifications, they determined he was qualified, and now after they get rid of this 58-year-old guy, 58-year-old guy and replace him with a 23-year-old guy. Or 62-year-old guy. 62-year-old guy, and they're saying the 62-year-old guy wasn't qualified for the job that this young, upstart 23-year-old kid was qualified for. If you want to push that argument, that's... And respectfully, too, even if we get beyond that argument as the district court did, there's still, I think, a burden that the plaintiff doesn't meet to defeat the summary judgment. So I still don't think we get to a jury trial. A pretext issue. Correct. So I would still argue respectfully that we still don't get to a jury trial on this case. Okay, Mr. Unger, you deserve quite a bit of rebuttal, I believe. Thank you. Thank you, Mr. Rasey. Thank you, Your Honor. Your Honors, I believe the case law supports that the elements that go to the prima facie case go to the showing that the preferred reason given by the employer is not worthy of credence. The jury can consider those in determining whether or not you've met your burden on pretext. I'm sorry, Judge? The jury can consider the elements of the prima facie case if you've made out the prima facie case in determining whether or not you've met your burden on showing pretext of the proper reason. Yes, Your Honor. In this case, clearly the company violated its progressive discipline policy as well. That was testified to by numerous witnesses. Is that relevant, though, to the discrimination cause of action? Isn't that more of a contract issue? Judge Chagras, I would argue that because of all the other things in the briefs and all the other facts, that that's just an added fact to show that the defendant's preferred reason isn't worthy of credence. They have this progressive that they want to get rid of Mr. Finn because he's older. They have this progressive discipline policy. He has no write-ups for a year and a half. Boom, November 16th, there's a big problem.  In the meantime, you had a performance evaluation that showed some issues, right? There's no question that the last performance evaluation, Judge Ambrose, back in the spring of 2006, had some issues, but, you know, it wasn't that bad. And she was still trying to force them out. These younger employees, these younger employees were treated a lot better. There is testimony that they had a college recruitment program. Now, keep in mind that they were trainees. So, I mean, they're not going to have nearly the responsibility that somebody who's got a lot more experience is going to have. I believe these young men stated that after a few months they were thrown into the fire. They were not disciplined as harshly as Mr. Finn. They were not – their job wasn't threatened like Mr. Finn's job was threatened. They committed the same so-called infractions, if you will, that Mr. Finn committed. This is a trucking company with trucks and trailers all over the place and containers. So they would lose track of them. There's a big computer system, walkie-talkies. It's a very overwhelming communications-oriented job, the fleet manager. Isn't the employer entitled to expect a little more from a person like your client who's been around for a long time? You know, I mean, rookies make mistakes. Yes, Your Honor. In general, yes, I do agree. But in this case, these people were already not rookies. They were already well into performing the job. And they were treated by Ms. Suwalla much more fairly, these 20-year-old guys, than my client. He got these merit raises. I don't know how you can characterize them as anything but they were merit raises. Then they would use the buzzwords. As we all know, it's not only in the case law. No employer is going to make a notation in a personnel file, we're getting rid of you because you're 62, you're too old. They use buzzwords, can't keep up. And the last write-up by Ms. Suwalla in the telephone log has these buzzwords, can't keep up, can't meet goals. That's how you get rid of an older person. Let's just say if it's true that he could not keep up, that's got nothing to do with age. That could be a good reason to fire, right? Yes, but that wasn't the case here based on all the other evidence. He could keep up. I'm sorry. What makes can't keep up? What supports your interpretation other than you've read where it's sometimes used elsewhere? Was that part of the culture of this particular company? Did somebody testify that they used those words when they wanted to get rid of somebody who had an age issue and they wanted to ease them out the door? Not in particular, Judge, but when you take it in total with the young men experiencing the same things Mr. Finn experienced, not getting disciplined, Mr. Mordecai being forced out, having his workload increased, that up until Ms. Suwalla came in, Mr. Finn was highly qualified. He had no write-ups in the last year and a half. They terminated him suddenly. What would have helped you with Mordecai a lot? If Mordecai said, look, you know, they kept giving me more and more, and it was becoming clear to me they just wanted me out the door. And as far as I'm, you know, and I think it probably was age, and I just decided to heck with it. I'm not going to take any more. No sense fighting City Hall. I'm out of here. But he didn't say that. He didn't say that. What he said was, you know, the job got to be very difficult, and as far as I'm concerned, I just, I wanted it. I wanted something else. I wanted another way of life. I didn't want that. I understand him as having at least implied, if not stated, pretty clearly that he thought he was treated unfairly. And he was older. Mr. Unger, we thank you very much. And, Mr. Wiese, we thank you also for your very helpful argument. We'll take the matter under advisement.